STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
BLAND WILLIAMS, DEFENDANT-APPELLANT.

Argued January 21, 1963—Decided March 18, 1963.

See also 67 *N. J. Super.* 599, 171 *A. 2d* 137.

472

*Mr. Richard S. Cohen* argued the cause for the defendant-appellant.

*Mr. William D. Danberry,* Assistant County Prosecutor, argued the cause for the plaintiff-respondent (*Mr. Edward J. Dolan,* Middlesex County Prosecutor, attorney; *Mr. William D. Danberry,* of counsel and on the brief).

The opinion of the court was delivered by

PROCTOR, J. The defendant Bland Williams was convicted of murder in the first degree with a recommendation of life imprisonment. He appeals to this court as of right under *R. R.* 1:2–1(c).

On the night of July 19–20, 1956 the Koppers Coke Company's office building in Port Reading, Middlesex County, was broken into, its safe was removed and forced open, and its relief engineer, James Quackenbush, was brutally beaten to death. In January 1957 separate indictments were returned against Bland Williams, his brother Eugene Williams, William Butler, James Winbush and John Coleman, charging them with the murder of Quackenbush. The indictments were in the authorized short form and charged murder generally. Winbush was hospitalized for mental illness and has never stood trial. Bland Williams, Eugene Williams and Butler were tried together in 1957, and Coleman (who was later sentenced to the Bordentown Reformatory on his plea of *non vult*) was the State's principal witness. Coleman testified that he witnessed the killing of Quackenbush by Butler during the course of the Koppers Company robbery in which he (Coleman) and all the others participated.

Butler and the Williams brothers were convicted of murder in the first degree and sentenced to death. On appeal, this court reversed because of error by the trial judge and remanded the matter for a new trial. See *State v. Butler*, 27 *N. J.* 560 (1958). Accordingly, in 1959, Butler and the Williams brothers were again brought to trial and Coleman was once more the State's principal witness. After about a month of trial, a motion for mistrial was made because of an alleged violation of jury sequestration. While the trial court was considering the motion, counsel for Bland Williams and Eugene Williams informed the court that their clients wished to withdraw their not guilty pleas and enter pleas of *non vult* to second degree murder. The court accepted the new pleas and later sentenced each of them to 10 to 15 years imprisonment. After the acceptance of the Williams brothers' pleas, a mistrial was declared as to Butler. He was later retried alone, with Coleman again testifying for the State, and was convicted of murder in the first degree and sentenced to death. This court affirmed the conviction. *State v. Butler*, 32 *N. J.* 166 (1960). Butler's sentence was commuted by Governor Meyner to life imprisonment.

Sometime later, Bland Williams moved to withdraw his plea of *non vult* to second degree murder on the ground that it was not voluntarily and understandingly made. Counsel was assigned to represent him and, after a hearing, the trial court granted the motion, reinstated his not guilty plea, and ordered him to stand trial on the original indictment. The assignment of counsel was extended for the purpose of trial.

Before the trial, Williams moved to vacate the indictment and to limit the verdict to second degree murder. He also moved for a change of venue. The motion to vacate and to limit the verdict was denied, but the motion for a change of venue was granted and the trial was moved to Essex County. After a lengthy trial, the jury rendered a verdict of guilty of murder in the first degree with a recommendation of life imprisonment. Present counsel was subsequently appointed to represent the defendant on this appeal, and this court granted

his motion to supplement the record with the transcript of a post-trial examination of the defendant by his present counsel, and with the appendices on appeal in *State v. Butler, supra,* 27 *N. J.* 560 (1958), and *State v. Butler, supra,* 32 *N. J.* 166 (1960).

As the defendant in his brief admits, the testimony against him in the present case was "in all essential respects the same as that extensively rehearsed by this Court in its opinions in 27 *N. J.* 560 (1958) and 32 *N. J.* 166 (1960)." Coleman supplied the sole material testimony connecting the defendant with the crime. Briefly, he testified that on the evening of July 19, 1956, he met Williams and his brother Eugene, along with Butler and Winbush, at the Little Cotton Club, a bar in Carteret; they entered a 1949 Buick automobile shortly before midnight, and the five of them drove from the Little Cotton Club to the Koppers plant; there, Coleman and Winbush were appointed lookouts by Butler, who was in charge, and Butler and the Williams brothers forced their way into the Koppers office building; when Quackenbush approached the building, Butler and the Williams brothers came out of the building and Butler beat Quackenbush with a large hammer handle until he lay still; thereafter, Butler and the Williams brothers dragged a safe out of the office building and unsuccessfully tried to force it open; Butler then blew up the safe with nitroglycerin which he had brought with him; immediately after the explosion, Coleman ran from the scene.

Williams denied any connection with the robbery and killing. He said that he had seen Coleman on occasion but did not "know" him. He further testified that on July 19, 1956, he never left the City of Perth Amboy; he spent the evening at a tavern there until about midnight, at which time he went directly to his room in Perth Amboy and slept through the night.

A more extensive discussion of the conflicts in the testimony would serve no purpose here. It is enough to say that there was sufficient testimony which, if believed by the jury,

established that Williams was guilty of murder in the first degree as charged by the State. See *State v. Butler, supra,* 32 *N. J.,* at *p.* 176. We now address ourselves to the various legal points raised by the defendant in his brief on this appeal.

The defendant first contends that the court below erroneously denied his motion to vacate the indictment and to limit the trial verdict to murder in the second degree.

As mentioned above, after reversal by this court of his first conviction, 27 *N. J.* 560 (1958), Williams was again brought to trial. When the retrial had progressed about a month, Williams, through his counsel, sought the court's permission to withdraw his pleas of not guilty and to enter a plea of *non vult* to second degree murder. After the prosecutor stated that he had no objection to the change of plea, the court permitted the withdrawal of the plea of not guilty to murder in the first degree and accepted the plea of *non vult* to murder in the second degree. Three days later, Williams was sentenced to 10 to 15 years imprisonment. After he spent some time in prison, he successfully moved through newly assigned counsel to have his sentence vacated and the *non vult* plea withdrawn on the ground that it was not voluntarily and understandingly made. The trial court reinstated his plea of not guilty and ordered him to stand trial on the original, short-form indictment charging him with murder generally.

In his motion before the trial court to vacate the indictment and limit the jury's verdict to second degree murder, the defendant relied on the doctrine of *autrefois acquit* and argued that the court in the previous trial, by accepting his plea of *non vult* to second degree murder, impliedly acquitted him of first degree murder and thereby barred a subsequent trial for that offense. The trial court denied the motion and the defendant urges that this was error, citing *State v. Williams,* 30 *N. J.* 105 (1959), and *Green v. United States,* 355 *U. S.* 184, 78 *S. Ct.* 221, 2 *L. Ed. 2d* 199 (1957).

In *Williams,* we held that where a defendant is tried before a jury on a short-form murder indictment and found guilty

of second degree murder, and thereafter obtains a reversal, he cannot be tried for first degree murder. We said that by returning a verdict of second degree murder, the jury, by necessary implication, acquits the defendant of first degree murder, *id.*, at *p.* 119, and that his appeal from a conviction of second degree murder cannot constitutionally be interpreted as a waiver of jeopardy as to the first degree murder acquittal.[1] *Id.*, at *pp.* 122–124.

In *Green,* the defendant was indicted for a felony murder arising out of the crime of arson. He was convicted of arson and second degree murder, won a reversal, and was again tried for murder in the first degree. The United States Supreme Court, in holding that the defendant could not again be tried for murder in the first degree, said:

> "Green was in direct peril of being convicted and punished for first degree murder at his first trial. He was forced to run the gantlet once on that charge and the jury refused to convict him. When given the choice between finding him guilty of either first or second degree murder it chose the latter. In this situation the great majority of cases in this country have regarded the jury's verdict as an implicit acquittal on the charge of first degree murder. * * * In brief, we believe this case can be treated no differently, for purposes of former jeopardy, than if the jury had returned a verdict which expressly read: 'We find the defendant not guilty of murder in the first degree but guilty of murder in the second degree.'" 355 *U. S.* at *pp.* 190–191, 78 *S. Ct.,* at *p.* 225, 2 *L. Ed.* 2d at *p.* 206.

The defendant here argues that the trial court's acceptance of his plea of *non vult* to second degree murder is analogous to a jury's verdict of second degree murder, and contains an implied acquittal of first degree murder.

██ *N. J. S.* 2A:113–3, which permits the acceptance of *non vult* pleas to murder indictments, provides:

---

[1] *Williams* did not involve a felony murder, and we expressly reserved the question whether the rule would apply to such a case where the jury, contrary to instructions, might return a second degree murder verdict on its own initiative. *State v. Williams, supra,* at *p.* 124; *cf. Green v. United States, supra.*

"In no case shall the plea of guilty be received upon any indictment for murder, and if, upon arraignment, such plea is offered, it shall be disregarded, and the plea of not guilty entered, and a jury, duly impaneled, shall try the case.

Nothing herein contained shall prevent the accused from pleading *non vult* or *nolo contendere* to the indictment; the sentence to be imposed, if such plea be accepted, shall be either imprisonment for life or the same as that imposed upon a conviction of murder in the second degree."

A defendant should not be permitted to plead *non vult* to any particular degree of murder. In the words of the statute, the plea is to be directed "to the indictment," which charges murder generally. *State v. Walker,* 33 *N. J.* 580, 588 (1960). Nor does the statute contemplate a hearing before the trial court as to the degree of guilt of the defendant either for the purpose of determining whether to accept the plea, or to determine the sentence to be imposed thereon. *State v. Magonia,* 25 *N. J.* 95, 98 (1957). Where a plea of *non vult* is offered to an indictment charging murder generally, the factual issue of the degree of the defendant's guilt is not before the court, and the court has no occasion to pass upon it. *State v. Walker, supra,* 33 *N. J.,* at *pp.* 588–589. Therefore, it is irregular for the court to accept a plea of *non vult* to second degree murder, as distinguished from a plea of *non vult* to the indictment. Although this irregularity would not be fatal, it would not imply a finding that the defendant is innocent of first degree murder.

Unlike *Williams* and *Green,* where the jury, by finding the defendant guilty of second degree murder only, implicitly found that the proof was not sufficient to warrant a conviction of murder in the first degree, the trial court here, in accepting the defendant's plea of *non vult* to second degree murder, had no occasion to pass upon the sufficiency of the proof as to the greater degree. Hence, no factual implication of acquittal of first degree murder can be found in the trial court's acceptance of the plea to the lesser degree.

 The defendant also contends in conjunction with his above argument on former jeopardy that the acceptance of

his plea of *non vult* and the consequent termination of that trial present a bar to his retrial for first degree murder. He contends that "once a defendant is in jeopardy, any termination of his jeopardy short of verdict, other than by reason of his own application or stringent necessity, acts as an acquittal for purposes of former jeopardy." When the trial court accepted his "involuntary" plea of *non vult* and the trial was ended, he argues, he "was not taken out of jeopardy by his own voluntary act or by stringent necessity, but rather by the error of the trial court" in accepting the involuntary plea. He concludes, "[h]is jeopardy of conviction of first degree murder having thus ended, it was ended forever." There is no merit to this argument. Even though the defendant did not voluntarily and understandingly consent to the application to withdraw his plea of not guilty and enter the plea of *non vult*, the impetus for such change of plea did proceed from the defendant himself and his then trial counsel. The abortive ending of the trial before verdict was a result of the defendant's own actions, even though under circumstances which later moved the court to relieve him of their consequences. Thus, the setting in which the trial was terminated is similar to the situation where a defendant becomes sick in the course of a trial. *Cf. State v. Wolak,* 33 *N. J.* 399 (1960). In such an event, the discharge of the jury before verdict does not bar subsequent prosecution for the same offense. See *State v. Williams, supra,* 30 *N. J.,* at *p.* 121 and authorities cited therein. Since the defendant's own actions led the trial court to accept his plea of *non vult* in the first place, it would be unjust and opposed to the public interest to permit him, upon the successful assertion that such plea was not understandingly made, to raise the termination of jeopardy resulting from the acceptance of his plea in the former trial as a bar to the present prosecution. Fair dealing to society requires that once he has been permitted to withdraw his plea, he should be placed in the same position with respect to the indictment as he was before the plea was entered. See *State v. Stacy,* 43 *Wash. 2d* 358, 261 *P. 2d* 400 *(Sup. Ct.*

1953). The trial court properly denied the defendant's motion to vacate the indictment and to limit the verdict to murder in the second degree.

■ The defendant's second point is that the verdict was the result of coercion by the trial court. The case went to the jury at 2:17 P. M. on July 13, 1961. The jury returned at 9:25 P. M. and reported that there was a "deadlock." The trial court instructed them as follows:

"THE COURT: Members of the Jury, I realize fully that you have been considering your verdict since about 2:15. I am sure in the little more than seven hours that have gone by that you have been attempting to the best of your ability to follow the instructions of the Court and attempt to arrive at a verdict, whatever that verdict may be. I appreciate that. I feel also that you must appreciate the fact that we have been here in this courthouse for five weeks trying this case, in the selection of the jury and in the trial itself.

You have sent me a note in which you say for the purpose of the record, 'There is a deadlock.' If you ultimately cannot agree on the verdict, then it simply means that the case will have to be retried with another jury consisting of persons just like yourselves. Such a jury would be confronted with the same issues that you are confronted with, and this new jury would have to make the same decisions that you have been asked to make under the guidance of this Court.

I need not point out and I am sure you must fully realize the effort that has gone into the trial of this case on both sides and the Court. I find it necessary and I will therefore order that you continue to deliberate.

I charge you now that it is the duty of each juror, while the jury is deliberating upon its verdict, to give careful attention and consideration to the views on the testimony of his fellow jurors. A juror should not shut his ears and stubbornly stand upon the position he first takes, regardless of what may be said by his fellow jurors. It should be your collective objective to arrive at a common conclusion whether that be innocent or guilty, and to that end you should deliberate together with calmness. It is your duty to agree upon a verdict, if that is possible. The law contemplates that you shall by discussion harmonize your views, if possible, but not that you shall compromise, divide and yield your personal convictions for the purpose of arriving at an agreement.

I charge you finally that in your further deliberation that I am going to ask you to commence again, that you consider everything that I have heretofore said to you in my original charge, and that which I have just said to you now in this short supplemental charge, and I trust in fairness to everybody concerned that you will approach your

problem again with the thoughts in mind that I have just tried to give you.

So will you please take the jury back to the deliberating room, please."

Immediately after the jury returned to their deliberations, defense counsel moved the court to discharge the jury on the ground that the above-quoted supplemental instruction constituted "judicial duress." The motion was denied. At 11:00 P. M. the jury had not yet reached a verdict and the court released them from further deliberations until the next day. Defense counsel renewed his prior motion to discharge the jury and the court again denied it.

At 9:30 A. M. the following day (July 14, 1961), the court reconvened and the jury was given another supplemental instruction:

"THE COURT: Good morning, members of the jury. I trust that you have had a good night's rest, so as to enable you to continue with your deliberations in an atmosphere of calmness, without surrendering your individual scruples or your personal views.

I further instruct you that the jurors should examine with candor the issues submitted to them, and with due regard and deference to the opinions of each other. In conferring together, the jury ought to pay proper respect to each other's opinions and listen with candor to each other's arguments.

If the larger number of the panel are for conviction, a dissenting juror or jurors should consider whether the doubt in their minds is a reasonable one which makes no impression upon the minds of so many others equally honest, equally intelligent with himself, who have heard the same evidence, with the same attention, and with an equal desire to arrive at the truth, and under the sanction of the same motive. And, on the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves the same questions, and whether they may not reasonably or ought not to doubt the conclusions [correctness?] of a judgment which is not concurred in by most of those with whom they are associated, and to discuss the weight or sufficiency of that evidence which fails to carry conviction in the minds of their fellow jurors.

In your further deliberations you will consider everything that I have heretofore said to you in my original charge, my supplemental charge of last night, and what I have said to you this morning. I request that you approach your task this morning with these instructions in your minds, and I trust that upon further reasonable deliberation you will be able to reach a conclusion by your verdict.

The attendants will please see to it that the jury is taken to their deliberation room. We will stand adjourned until they return."

Defense counsel again unsuccessfully moved the court to discharge the jury on the ground that the supplemental charges were coercive.

At 12:30 P. M. the court recalled the jury and questioned them as follows:

"THE COURT: * * * Do you think, Mr. Foreman, that there is any further instruction that I can give you that would be of any help to the jury in arriving at its verdict, or are you so hopelessly deadlocked that you feel you cannot conscientiously arrive at a verdict at this time?

THE FOREMAN: No.

THE COURT: I am sorry. Let us try it over again. Do you feel that you are so hopelessly deadlocked that you cannot reach a verdict?

THE FOREMAN: No.

THE COURT: You think that you may be able to reach a verdict if I ask you to continue your deliberations?

THE FOREMAN: Yes.

THE COURT: Do you think that any instructions that I can give you would be of any help to the jury?

THE FOREMAN: Yes.

THE COURT: All right, then. Supposing you go back to your jury room, if you will, and write on a sheet of paper on what subject you would like the Court to give you some additional instructions. Then I will try, to see if that will be of some help to you. All right. Will you go back to your room and write it down and send it out. We will adjourn until I get the note."

The jury returned to the jury room and sent a note to the court, asking for instructions on the subject of reasonable doubt. The court so instructed them at 12:46 P. M. and sent them back for further deliberation. At 2:50 P. M. the jury returned with their verdict.

The defendant argues that "the trial court's repeated emphasis on discussion and adjustment of views necessarily caused one or more of the jurors, after some 13½ hours of deliberation, to abandon firm convictions," and that "[t]aken as a whole, the court's urging of agreement had the tendency to authorize and encourage jurors to reach 'a common conclusion' somewhere between their individual opposing views."

██ It was well within the discretion of the trial court to return the jury for further deliberation after they had announced their inability to arrive at a verdict. *State v. Pontery,* 19 *N. J.* 457, 477 (1955). A judge may urge upon the jury the importance of reaching an agreement, as long as he instructs them that such agreement is not to be had at the sacrifice of the conscientious convictions of the individual jurors. *In re Stern,* 11 *N. J.* 584, 588 (1953). We see nothing in the supplemental charges which would in any way interfere with the independent thinking of the members of the jury. The essence of the instructions was nothing more than an earnest request to the jurors that they should consider each other's views and attempt to reconcile their differences in an effort to agree upon a verdict if they could conscientiously do so. In *Allen v. United States,* 164 *U. S.* 492, 501–502, 17 *S. Ct.* 154, 157, 41 *L. Ed.* 528, 531 (1896), the United States Supreme Court approved supplemental instructions similar to those given by the trial court in the present case, saying:

"While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. * * * It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment; or that he should close his ears to the arguments of men who are equally honest and intelligent as himself."[2]

---

[2] In *Allen v. United States* the approved charge was stronger in urging the jury to reach an agreement than the charge in the present case. In the cited case the charge contained an admonition to the jurors "that they should listen, with a disposition to be convinced, to each other's arguments." 164 *U. S.*, at *p.* 501, 17 *S. Ct.*, at *p.* 157, 41 *L. Ed.*, at *p.* 531. Although the *Allen* charge has been subjected to some criticism, see *Green v. United States,* 309 *F.* 2d 852, 854 (5 *Cir.* 1962); *Huffman v. United States,* 297 *F.* 2d 754, 759 (5 *Cir.* 1962) (dissenting opinion), it has been consistently followed in the federal courts. See *United States v. Rogers,* 289 *F.* 2d 433 (4 *Cir.* 1961) and cases cited therein; see also 27 *F. R. D.* 39, 102 (1960) and cases cited therein. However, we think the trial judge in the present case wisely omitted the above-quoted admonition from his supplemental instructions.

Moreover, it is to be noted that the last supplemental charge complained of here was given more than five hours before the jury returned its verdict. Such a lengthy period of deliberation after that charge militates against the suggestion that any member of the jury was influenced by the supplemental charges into an agreement with his fellows against his own personal convictions. *Cf. In re Stern, supra,* 11 *N. J.,* at *p.* 589; *State v. Cottone,* 52 *N. J. Super.* 316, 326 (*App. Div.* 1958), certif. denied 28 *N. J.* 527 (1959).

We find no error in the trial court's supplemental charges to the jury.

The defendant next contends that there was error in the following portion of the trial court's charge to the jury:

"If I were to try to sum up the facts in this case in a single sentence I think I could almost do it this way. I could say, 'Members of the jury, you have got to make up your minds who is telling the truth in this case. Was the witness Coleman telling the truth when he told you what happened about this case?' And you have to determine: was Bland Williams, the defendant, telling you the truth when he told you where he was on the day of July 19, 1956 and the early hours of the morning of July 20. It is as simple as that. All of the rest of the testimony that you heard helps make up the whole picture, so to speak. It is to help you in your determination of where the truth lies. But basically and fundamentally, it is: who is telling the truth. This is the sole, important, issue in this case."

Since there was no objection directed to this portion of the charge at the time of the trial, the defendant must demonstrate plain error within *R. R.* 1:5–1(a), that is, an error possessing a clear capacity to bring about an unjust result. *State v. Thornton,* 38 *N. J.* 380, 396 (1962). It is the defendant's contention that the above-quoted portion of the charge prejudiced him in that, in effect, the jury was told to disregard the "possibilities that neither of the witnesses might be entitled to full credence or indeed any credence at all." And thus, it is argued, the jury was told, in effect, that if they rejected as false Williams' testimony as to his whereabouts on the day and night of the murder, they were to accept Coleman's testimony that the defendant was a partici-

pant, since that portion of the charge presented only those two alternatives. However, in ascertaining whether or not there was error, a single portion of the charge may not be extracted and construed without regard to the context of the entire charge. The charge must be read as a whole in the light of a sensible construction to determine its effect. *State v. Peterson,* 10 *N. J.* 155, 161 (1952) ; see also, *State v. Haines,* 18 *N. J.* 550, 564 (1955). An examination of the entire charge clearly shows that the jury was fully given to understand that even if Williams' testimony was not wholly believed, it still could create such a degree of uncertainty concerning his whereabouts· as to cast a reasonable doubt of his guilt. The jury was further told that even if they completely rejected Williams' testimony, the State was still under the burden of satisfying them of the defendant's guilt beyond a reasonable doubt. The court instructed the jury that it was their function alone to determine what weight should be given to Coleman's testimony, and expressly advised them that Coleman's testimony, coming from a confessed criminal who possibly had a strong motive of hope of favor, should be received with great caution and carefully scrutinized, and that it should not be accepted as a sufficient basis for convicting the defendant unless they found "satisfactory corroboration in the evidence or in the testimony of other and unsuspected witnesses upon such material circumstances as tend directly to establish the guilt of the accused."

In any event, the court in the challenged portion of the charge was not setting forth a legal principle for the jury to follow, but was merely expressing an opinion respecting the evidence in the case. The court's remarks immediately preceding the challenged portion bear this out:

"Now I don't intend to go over, as I said, all of the evidence in this case or the inferences that you have a right to draw from it, which is your function, because that would be mere repetition. But I do point out to you that I will talk about a few things just to point up what I think you may want to consider amongst the other things that you will consider when you retire to the jury room."

Comments on the evidence by a court in its charge to the jury, similar to those challenged here, were sustained by this court in *State v. Haines, supra,* at *pp.* 563–564; and *State v. Peterson, supra,* at *pp.* 161-162.

In the context of the entire charge, we find no basis for the defendant's challenge to the above-quoted remarks of the court.

The defendant next argues that the trial court erred in admitting testimony that Coleman made a prior extrajudicial identification of the defendant.

At the trial, Coleman identified the defendant as one of the participants in the robbery which resulted in the killing of Quackenbush. He also testified that he had identified the defendant when the latter appeared in a line-up at Perth Amboy Police Headquarters. Two police officers corroborated Coleman's testimony about the line-up and said further that the identification took place on August 28, 1956, the day the defendant was apprehended. No objection was made to any of this testimony, but it is now urged that the State should not have been permitted to bolster the courtroom identification with inadmissible extrajudicial evidence, and that the defendant was so prejudiced thereby that it constitutes plain error. The defendant concedes, however, that if Coleman's testimony is held acceptable, the introduction of the police officers' testimony cannot alone require a new trial, at least in the absence of a timely objection. Therefore, the question presented here is whether a witness who identifies the accused at the trial may also be permitted to testify to a prior, out-of-court identification of the accused.

Although there appears to be no case in this State dealing squarely with the above question, the admission of testimony of a witness' prior identification of the defendant has been held not to constitute plain error. *State v. Landeros,* 20 *N. J.* 69 (1955); *State v. Bennett,* 75 *N. J. Super.* 207 (*App. Div.* 1962). In *State v. Buffa,* 31 *N. J.* 378, 379–380 (1960), *cert. denied* 364 *U. S.* 916, 81 *S. Ct.* 279, 5 *L. Ed.* 2d 228 (1960), this court, in referring to the opinion of the Appel-

late Division reported in 51 *N. J. Super.* 218 (*App. Div.* 1958), said:

"The last paragraph of the opinion refers to the introduction by the State of testimony showing prior consistent, out of court identification of the defendants by the witness giving identification evidence at the trial. The court suggested that the present trend of judicial authority is to allow such proof and cited the pertinent cases. But it inferred that the New Jersey rule may be to the contrary, citing *State v. Landeros,* 20 *N. J.* 69, 72 (1955); *State v. D'Ippolito,* 22 *N. J.* 318, 322 (1956), and it held that, in any event, since such testimony was not objected to by experienced counsel and plain error did not appear, reversal was not justified. We agree that there is much persuasive force in the majority rule which sanctions admissibility of such proof when the person who made the earlier out of court identification appears as a witness at the trial of the case and identified the defendants in court or indicates that he is unable to do so at that time. The state of the record, however, makes it unnecessary to decide the problem in this case and decision thereon is reserved."

The majority view today is that prior identification may be shown by the testimony of the identifying witness in corroboration of his identification of the accused at the trial. See the extensive annotation in 71 *A. L. R. 2d* 449 (1960). A reason frequently assigned for the admission of evidence as to a prior identification of an accused is that such evidence is generally more reliable than the same witness' identification of the accused at the trial. *Id.,* at *p.* 454. As said by Dean Wigmore:

"Ordinarily, when a witness is asked to *identify* the assailant, or thief, or other person who is the subject of his testimony, the witness' act of pointing out the accused (or other person), then and there in the court-room, is of little testimonial force. After all that has intervened, it would seldom happen that the witness would not have come to believe in the person's identity. The failure to recognize would tell for the accused; but the affirmative recognition might mean little against him.

* * * To corroborate the witness, therefore, it is entirely proper * * * to prove that *at a former time,* when the suggestions of others could not have intervened to create a fancied recognition in the witness' mind, he recognized and declared the present accused to be the person. If, moreover (as sometimes is done) the person

was then so placed among others that all probability of suggestion (by seeing him handcuffed, for example) is still further removed, the evidence becomes stronger. The typical illustration is that of the identification of an accused person at the time of arrest." 4 *Wigmore, Evidence*, § 1130, *p.* 208 (*3d ed.* 1940).

We think that a witness' prior, out-of-court identification of an accused, if made under circumstances precluding suspicion of unfairness or unreliability, is admissible to corroborate the witness' identification of the accused at the trial. See *Basoff v. State*, 208 *Md.* 643, 119 *A. 2d* 917, 921 (*Ct. App.* 1956); *State v. Frost*, 105 *Conn.* 326, 135 *A.* 446, 452–453 (*Sup. Ct. Err.* 1926); see also *DiCarlo v. United States*, 6 *F. 2d* 364 (*2 Cir.* 1925); *People v. Gould*, 54 *Cal. 2d* 621, 7 *Cal. Rptr.* 273, 354 *P. 2d* 865 (*Sup. Ct.* 1960); Note, 109 *U. Pa. L. Rev.* 1182 (1961); Committee annotation 2D on Rule 63(1), *Report of the Committee on the Revision of the Law of Evidence to the Supreme Court of New Jersey, p.* 120 (1955). The record shows that the circumstances in which Coleman made his prior identification of the defendant in the Perth Amboy police line-up were sufficient to satisfy the requirements stated in the foregoing rule, and therefore there was no error in the admission of Coleman's testimony regarding the prior identification.

The defendant also raises as a ground for reversal the allegation that he was inadequately defended by his assigned counsel at the trial. However, our study of the entire record, including the supplemental transcript and appendices, reveals no justification whatever for this charge. The supplemental transcript shows that the defendant complains merely of matters of trial strategy. On the record before us these matters are clearly insufficient to ground a constitutional claim of inadequacy of representation by counsel. *Cf. Diggs v. Welch*, 80 *U. S. App. D. C.* 5, 148 *F. 2d* 667 (1945), *cert.* denied 325 *U. S.* 889, 65 *S. Ct.* 1576, 89 *L. Ed.* 2002 (1945).

The defendant's last contention, that the verdict of the jury was against the weight of the evidence, is also not

supported by the record. There was ample evidence to justify a finding of guilt beyond a reasonable doubt if the crucial portion of Coleman's testimony relating to the defendant's participation in the robbery and killing was believed. Since matters of credibility and the responsibility for determining the defendant's guilt have been entrusted solely to the jury, we may not upset its verdict as against the weight of the evidence unless there is a plain and obvious failure of the jury to perform its function. See *State v. Butler, supra,* 32 *N. J.,* at *p.* 196; *State v. Monahan,* 16 *N. J.* 83, 93 (1954), *cert.* denied 348 *U. S.* 889, 75 *S. Ct.* 210, 99 *L. Ed.* 698 (1954); *R. R.* 1:5–1(a). No such failure appears in this case.

The judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.