PEOPLE v BILLS

PEOPLE v DANCER

1. CRIMINAL LAW—EVIDENCE—SKETCHES—WITNESSES—IDENTIFICATION
   —HEARSAY—RES GESTAE.

   Admission into evidence of a sketch which was a composite
   picture made by a police artist from information furnished by a
   witness was proper, where the witness had twice viewed the
   subject on the day of a crime and soon after, when his memory
   was fresh and nothing had occurred to interfere with an
   accurate relating of the facts, described the subject to the artist
   who followed his instructions and made a composite drawing of
   the subject person; the fact that the witness could not identify
   one of the defendants as the person is not fatal to the sketch's
   admissibility because the description was more reliable under
   the circumstances than an in-court identification, dimmed by
   lapse of time and memory, and it is not unusual for a witness
   after a lapse of time to be unable to remember and identify a
   person; the sketch was admissible under the res gestae excep-
   tion to the hearsay rule.

2. CRIMINAL LAW—EVIDENCE—SKETCHES—WITNESSES—IDENTIFICATION
   —INSTRUCTIONS TO JURY—ACCOMPLICES—IMMUNITY FROM PROS-
   ECUTION.

   Instruction to the jury that a police artist's sketch received in
   evidence which was based upon a witness's description of a
   person he saw near the scene of the crime was to be used to
   determine if the sketch bore any resemblance or relation to
   either of two defendants was proper where the jury as finders
   of fact could consider the sketch in connection with one of the
   accomplices who was granted immunity, there was no theory of
   the defendants which asserted nor any evidence which showed

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 21 Am Jur 2d, Criminal Law § 369.
[3] 21 Am Jur 2d, Criminal Law § 147.
[4] 21 Am Jur 2d, Criminal Law § 494.
[5] 21 Am Jur 2d, Criminal Law § 484 *et seq.*
[6] 21 Am Jur 2d, Criminal Law §§ 120–123, 127, 129.
[7] 40 Am Jur 2d, Homicide § 72.

that the prosecution's witness was out of the car and walking around the buildings the morning of the crime, and the instructions permitted the jury to consider the sketch as depicting the prosecution witness or any other person, in accord with the witness's testimony that it depicted a person he saw that morning on two occasions.

3. Criminal Law—Accomplices—Immunity from Prosecution—Instructions to Jury—Witnesses—Credibility

Failing to refer specifically to an accomplice, who was granted immunity by the prosecution, while giving instructions to the jury regarding credibility of witnesses, was not error where during the trial the jury was informed through the examination of the prosecution witness that he had been granted immunity on the charge and he would not be tried for that offense; with this knowledge the specific words in the instruction "[y]ou may take into consideration a witness's interest, bias or prejudice, if any, his relationship to the parties involved in the case, any motive that he might have to testify one way or the other" covered the accomplice.

4. Criminal Law—Included Offenses—Instructions to Jury—Evidence.

A trial court is not required to charge the jury on lesser included offenses where there is no evidence present in a case that would show the commission of a lesser offense.

5. Criminal Law—Accomplices—Immunity from Prosecution—Cross-Examination—Plea of Guilty—Other Crimes—Witnesses—Credibility.

A ruling that the defense, on cross-examination of an accomplice who was granted immunity by the prosecution, was precluded from cross-examining the witness relative to an original charge against him but could cross-examine as to the events which resulted in a plea of guilty to a reduced charge was proper; the fact that the plea of guilty was offered and accepted on an unrelated crime which was committed by the witness was the subject of limited cross-examination and the ruling did not preclude the defense from attacking the witness's credibility by showing what was promised him by the authorities as a result of the plea of guilty.

6. Criminal Law—Indictment and Information—Aider and Abettor—Principal—Due Process.

An aider and abettor may be indicted, tried, and on conviction be

punished as a principal, and no denial of due process results from charging an aider and abettor as a principal.

7. HOMICIDE—FELONY MURDER—CONSTITUTIONAL LAW.
The felony-murder rule is constitutional.

Appeal from Wayne, John D. O'Hair, J. Submitted Division 1 April 10, 1974, at Detroit. (Docket Nos. 14442, 14257.) Decided May 29, 1974. Leave to appeal applied for.

Danny L. Bills and Lee J. Dancer were convicted of first-degree murder. Defendants appeal. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Thomas A. Ziolkowski,* Assistant Prosecuting Attorney, for the people.

*Daniel A. Burress, P. C.,* for defendant Bills on appeal.

*Joseph S. Cohen,* for defendant Dancer on appeal.

Before: J. H. GILLIS, P. J., and HOLBROOK and VAN VALKENBURG,* JJ.

HOLBROOK, J. The record discloses the facts in this felony-murder case to show that defendants Danny Lee Bills and Lee James Dancer and Michael G. Walker were together on March 12, 1971, from about 10 p.m. until sometime after the crime took place on Saturday morning, March 13, 1971. Michael G. Walker was granted immunity and

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

turned state's evidence and related the actions taken by the parties.

He stated that they had agreed to rob the Goddard Bar and went to the bar about 1:30 or 2 a.m. on March 13. They decided there were too many people in the bar at the time. They visited the Palace Restaurant and proceeded to a poker game in Lincoln Park, where they stayed until about 9 a.m. Defendant Bills had a gun. There was some talk about getting to see the victim without having to encounter the dogs that were present at his residence above his place of business. They tried to get sleeping tablets for the dogs, but were not successful.

Then it was decided to call the victim, tell him they were from the telephone company, would be there to put in new wires to the bar, and ask him to have the dogs removed from the porch. They purchased an orange stocking cap at Topps in Southgate, which Walker testified was worn by Bills.

From there, the three proceeded to the bar where Bills exited the automobile wearing the cap, went around the building and came back. He advised Dancer and Walker that the owner should be told that the telephone man was upon the porch. After Dancer did the same and returned, Bills went around back and went upstairs over the bar and was seen by Walker in the presence of the owner, Charles Wasson. The car was then driven to the rear of the parking lot where Dancer and Walker remained waiting for Bills. Walker was in the passenger seat. The apartment door was then seen to fly open and defendant Bills came running down the stairs and out toward Goodard Road. The cap was not on his head and he was running bent over. Dancer then backed the automobile out of

the parking lot, drove west along Goddard Road in front of what was described as Seaway Construction Company where Bills got into the back seat. Bills did not have anything with him when he returned. Walker and the two defendants then drove to the home of one Mrs. Rideout and left the car there, and went with her and others to the Hut Bar in Wyandotte. Mrs. Rideout testified that the three were driven to the Palace Restaurant where Walker's car was picked up.

Sometime later, Walker read a local newspaper and an artist's sketch purporting to be a sketch of one of the perpetrators of the crime. Thereafter, he got a call from defendant Bills concerning the sketch. The artist's sketch was based on information provided the police by Mr. Kincaid, who testified that on March 13, 1971, at about 10:30 a.m., he was working at his father's store, which was separated by a narrow parking lot from the Goddard Bar, and saw a man with an orange stocking cap looking in the window. Forty-five minutes later, he saw the same man running from the adjacent parking lot into a slow moving automobile. Thereafter, defendants Bills and Dancer were arrested and charged with first-degree murder. They were jointly tried in the Wayne County Circuit Court before the Honorable John D. O'Hair, in a jury trial that commenced March 7, 1972, and concluded April 4, 1972. Defendant Bills did not take the stand. Defendant Dancer did take the stand, denied being involved in any way and supplied testimony which conflicted with that of Walker as to the whereabouts of both defendant Bills and himself at the time of the alleged felony murder.

Both defendants were found guilty as charged and sentenced to life imprisonment.

The defendants raise several issues for determination by this Court.

I

Did the trial court err in admitting into evidence the sketch or composite picture of a person described by a witness who saw that person in close proximity of the crime and on two different occasions the morning of the crime?

Mr. Kincaid testified he saw the subject, first with an orange stocking cap on when the subject was looking into the store, at about 10:30 a.m., March 13, 1971; and secondly, about three-quarters of an hour later when he saw the subject, bent over, running and clutching a paper sack close to his body, at which time the subject was not wearing the orange stocking cap. Mr. Kincaid went to the police station about 1:30 p.m. the same day and described the subject to Officer Killebrew's daughter and she made the composite picture. The pertinent part of this testimony is as follows:

*"Mr. Easton (assistant prosecuting attorney):* I will ask that this be marked as People's Proposed Exhibit 23. (A sketch was marked as People's Proposed Exhibit No. 23 for identification by the court reporter.)

*"Q. (by Mr. Easton, continuing):* Mr. Kincaid, I will show you—again, try to keep it so it's only facing you. Have you seen that before?

*"A.* Yes, sir.

*"Q.* Who drew that?

*"A.* This would be Mr. Killebrew's daughter.

*"Q.* That took place in the Police Department?

*"A.* Yes, sir.

*"Q.* Now, looking at that, does that refresh your memory as to the description you gave, as far as you have mentioned the long side burns?

*"A.* Yes.

"*Q.* Now, looking at it, is there anything else about that face you recall having described to the young lady?

"*A.* It would be about the same as mine, that I gave it to her right here that I can recall.

"*Q.* What I am referring to, that mustache—

"*Mr. Burress (defense attorney):* I am going to object—

"*The Court:* Sustained.

"*Q. (by Mr. Easton, continuing):* Well, looking it over carefully, is there anything that you described here that is different than you described to the young lady?

"*Mr. Burress:* Well, objection, your Honor.

"Again, he described to the jury the basis upon which he described this person to the person drawn in the picture. It's obvious that the picture is different than the testimony.

"*The Court:* I am not sure it is.

"The question was objectionable because it was leading.

"*Mr. Easton:* I will try to rephrase it.

"*Q. (by Mr. Easton, continuing):* Have you had a chance to look at this?

"*A.* Yes.

"*Q.* Does this fairly represent the person you described to Officer Killebrew's daughter?

"*A.* Yes, sir.

"*Q.* As it stands there, as it is on that piece of paper, that represents the person that you saw; is that right?

"*A.* Yes, sir.

"*Q.* Is there any feature on that that you would like to change? Is there anything in that drawing you would now say you didn't see on March the 13th?

"*A.* No, sir, not that I can recall.

"*Q.* Did you only attend one sketching?

"*A.* Yes, sir, that I can recall.

"*Q.* This was the only sketch that you saw done in your presence?

"*A.* Well, she had some, run some copies which they made on the printing press and she made a big stack of copies of the same drawing.

"*Q.* In achieving this sketch, did you describe the eyes and nose and so on?

"*A.* Yes, sir.

"*Q.* The general contour of the face, did you describe that?

"*A.* Yes, sir.

"*Q.* And the chin, the neck?

"*A.* Yes, sir.

"*Q.* Did you feel that young lady, then, transferred these ideas on paper—

"*A.* Yes, sir.

"*Q.* —fairly well?

"*A.* She had one of those machines in front of her, make up machines with the different eyes and noses and stuffs on the plates.

"*Q.* You were able, then, to compare a lot of different eyes and noses and so on?

"*A.* Yes, sir."

Both the defendants and the people cite the case of *State v Ginardi,* 111 NJ Super 435; 268 A2d 534; 42 ALR3d 1198 (1970). In that case the defendant urged the Court to follow the New York rule that forbids the use of a composite picture made by an artist from information furnished by a witness or victim. The New Jersey Court in its opinion pointed out that the rule in New York is the same rule which (in that state) governs admissibility of a prior identification by the witness and the fact that New York courts exclude evidence of extrajudicial identifications of a composite sketch, not because of any inherent difference between sketches and photographs but because in New York all forms of extrajudicial identifications are deemed inadmissible hearsay, unless they follow within the limited scope of the state's code of criminal procedure, or are otherwise admissible under the recent fabrication exception to the hearsay evidence rule.

The New Jersey court in deciding the case stated on pages 453–454 of 111 NJ Super; pages 543–544 of 268 A2d; pages 1211–1212 of 42 ALR3d as follows:

"New Jersey and the majority of the other states which have dealt with the question have rejected the rule and philosophy of the New York court. They have adopted the view expressed years ago by Dean Wigmore, 4 Wigmore, Evidence (3d ed 1940), § 1130 at 208, that evidence as to a prior identification of an accused is generally more reliable than the same witness' identification of the accused at the trial. *State v. Williams,* 39 NJ 471, 489; 189 A2d 193 (1963), *cert den* 382 US 964; 86 S Ct 449; 15 L Ed 2d 366 (1965); *State v Matlack,* 49 NJ 491, 498; 231 A2d 369 (1967), *cert den* 389 US 1009; 88 S Ct 572; 19 L Ed 2d 606 (1967); *State v Sinclair,* 49 NJ 525, 545–547; 231 A2d 565 (1967); see also, *People v Gould,* 54 Cal 2d 621; 7 Cal Rptr 273, 275; 354 P2d 865, 867 (Sup Ct 1960); *State v Nordstrom,* 244 A2d 842, 846–847 (RI Sup Ct 1968); *State v Childers,* 313 SW2d 728, 731 (Mo Sup Ct 1958); *Judy v State,* 218 Md 168; 146 A2d 29, 31–33 (Ct App 1958).

. "In this state, a pretrial identification, if made under circumstances precluding unfairness and unreliability, is admissible where the person who made the identification is in court as a witness; and both the identifying witness and third persons can testify about such an identification. *State v Matlack,* 49 NJ 491; 231 A2d 369 (1967); *State v Williams* 39 NJ 471, 489; 189 A2d 193 (1963), *certiorari denied* 382 US 964; 86 S Ct 449, 450; 15 L Ed 2d 366 (1965). *[State v Sinclair, supra,* 49 NJ at 545; 231 A2d at 575].

"Further, the rule applies to pretrial identification of a photograph or photographs, *State v Matlack, supra,* 49 NJ at 497–498; 231 A2d 369; and the photographs may be admitted into evidence, *State v Dancyger,* 29 NJ 76, 91; 148 A2d 155 (1959), *cert den* 360 US 903; 79 S Ct 1286; 3 L Ed 2d 1255; *State v O'Leary,* 25 NJ 104, 115; 135 A2d 321 (1957). (It may be noted that police procedures of seeking initial identifications from photographs have received the approval of the United States

Supreme Court. *Simmons v United States*, 390 US 377, 384; 88 S Ct 967, 971; 19 L Ed 2d 1247, 1253 [1968]). * * *

"What has been said with respect to the admissibility of an extra-judicial identification of a photograph is fully applicable to an extra-judicial identification of a composite sketch prepared from a description given by a victim and by him identified, when the composite was completed, as a likeness of the culprit. In each case the eyewitness' statement is that what he sees, be it a photograph or a composite sketch, looks like the offender. Indeed, the procedures used in this case in preparing the composite would appear practically to eliminate the danger present in other extra-judicial identifications, whether of persons or of photographs, that the person or photograph to be selected was suggested to the eyewitness by others present at the identification."

In the case of *People v Poe*, 388 Mich 611, 616; 202 NW2d 320, 322–323 (1972), the Court reiterated the law in Michigan that pretrial identifications are permissible.

Therefore, the reasoning of the majority opinion in *Ginardi* would approve the trial court's action in admitting the sketch.

We now turn to the dissent in *Ginardi*, 111 NJ Super p 457–458; 268 A2d p 546; 42 ALR3d p 1214, wherein it is stated in part as follows:

"Such sketches have been deemed admissible where the descriptions on which they were based were made so soon after the crime as to qualify under the *'res gestae'* or 'spontaneous utterance' exception to the hearsay rule, *State v Davis*, 91 NJ Super 470, 474–476; 221 A2d 47 (App Div 1966), *cert den* 48 NJ 137; 224 A2d 323 (1966); *Commonwealth v Rothlisberger*, 197 Pa Super 451; 178 A2d 853 (Super Ct 1962) (dictum, 178 A2d at 853), or by way of exception based upon a justified buttressing of the in-court identification testimony of a witness whose identification of defendant has

been attacked by the defense as a recent fabrication. *People v Coffey,* 11 NY2d 142; 227 NYS2d 412; 182 NE2d 92 (Ct App 1962). As noted above, the substance of this latter exception is now codified in this state by way of Evidence Rule 20 as one of the exceptions to the absolute prohibition of *any* evidence to support the credibility of a witness.

"Admission of the sketches here involved obviously does not fall within the 'spontaneous utterance' exception, the giving of the descriptions and the attendant preparation of the sketches having taken place two days after the criminal event." (Emphasis in original.)

In the instant case Mr. Kincaid viewed the subject twice on the morning of the crime—a few minutes before and a few seconds after the crime. Soon thereafter, at 1:30 p.m., Mr. Kincaid, when his memory was fresh and nothing having occurred to interfere with an accurate relating of the facts, described the subject to the artist who followed his instructions and made a composite drawing of the subject person. It can be said that the subject description was more reliable under the circumstances than an in-court identification, dimmed by lapse of time and memory. The fact that Mr. Kincaid could not identify one of the defendants as the subject person is not fatal to the sketch's admissibility. It is not unusual for a witness after a lapse of time to be unable to remember and identify a person. Even under the ruling law stated in the dissent the sketch was admissible under the res gestae exception to the hearsay rule. We find no error in the trial judge's action in admitting the sketch.

II

Defendants claim that the trial judge erred in not instructing the jury that in considering the

sketch as finders of fact they could consider it in connection with one of the accomplices who was granted immunity.

This claim is based on the provision of MCLA 768.29; MSA 28.1052, which provides in part: "instruct the jury as to the law applicable to the case and in his charge make such comment on the evidence, the testimony and character of any witnesses, as in his opinion the interest of justice may require".

The trial judge during the taking of testimony instructed the jury on this matter as follows:

"Mr. Easton, just a moment, please.

"Members of the jury, the court would like to correct a misstatement that it made.

"The court, during the time it was receiving People's Proposed Exhibit No. 23 into evidence, made a statement to the effect that Mr. Kincaid gave a verbal description to an artist and that that description related to either of the defendants.

"I do not believe that Mr. Kincaid directly made such a statement in his testimony.

"The court received this Exhibit, People's Exhibit 23 as an artist's sketch based upon Mr. Kincaid's description of a person he saw at or in close proximity to the Goddard Bar on the morning of March 13, 1971. It is for you to determine if this artist's sketch bears any resemblance or relation to either of the defendants.

"The point that I am attempting to make is simply that I do not believe that Mr. Kincaid at any time in his testimony stated that this artist's sketch was a picture of either of the defendants. His testimony was that this was an artist's sketch of a person whom he saw at or in close proximity to the Goddard Bar.

"Any statement that I have made contrary to this you are to disregard, members of the jury."

There was no theory of the defendants that asserted, nor was there any evidence, that Mr.

Walker was out of the car and walking around the buildings the morning of the crime. Also the instructions permitted the jury to consider the sketch as depicting Mr. Walker or any other person, in accord with John Kincaid's testimony—that it depicted a person he saw that morning on two occasions.

The instructions were proper and no error resulted.

### III

Did the court err in failing to specifically refer to an accomplice, while giving the instructions to the jury regarding credibility of witnesses?

Defendants contend that the court erred in failing to give the jury the following instructions:

> "(4) It is proper for the defense to prove the expectation of gain of any witness for the prosecution whether founded upon any agreement with the prosecution or not, under which said witness for the prosecution testified, and if the defense have made a showing that there is or was such expectation of gain, the testimony of such witness for the prosecution must be received with great caution. *People v Knoll,* 258 Mich 89, 100; 242 NW 222 (1932)."

The trial judge gave very thorough instructions on the subject of credibility of witnesses and stated in part as follows:

> "As the sole triers of the facts, you must determine which witnesses you will believe and what weight you will give to their respective testimony. If you should conclude that any witness has knowingly testified falsely on any material issue of fact, you may disregard that witness's entire testimony. However, if you believe that there are parts of such witness's testimony that are worthy of belief or which have been corroborated by

other evidence that you believe is worthy of belief, then you may accept those parts as credible and reject those parts of the witness's testimony which you feel are unworthy of belief.

"You are the sole judges of the credibility of the witnesses and the weight to be given to their testimony. I will tell you now that credibility means truthfulness, believeability *[sic]*. You may take into consideration a witness's interest, bias or prejudice, if any, his relationship to the parties involved in the case, any motive that he might have to testify one way or the other; the probability of the story related by him and all the other circumstances and facts in evidence which in your judgment would add to or detract from his credibility or the weight to be given to his testimony.

"In weighing the testimony of the witness, you have a right to consider his candor and fairness, his manner and bearing while testifying before you, the reasonableness of his story, the means and opportunity of knowing the facts in the case and in all other matters that tend to impress your minds with the truth or untruth of his testimony.

"If there is a conflict in the testimony of the witness, it is your duty to say where the truth lies. You are not bound to accept as true the statements of witnesses where they are unreasonable or inconsistent with each other or with the known facts in the case."

During the trial the jury was informed through the examination of Mr. Walker that he had been granted immunity on this felony-murder charge, and would not be tried for this offense. With this knowledge the specific words in the instruction "[y]ou may take into consideration a witness's interest, bias or prejudice, if any, his relationship to the parties involved in the case, any motive that he might have to testify one way or the other" covered the requested instruction. In the case of *People v Knoll,* 258 Mich 89, 101; 242 NW 222 (1932), it is stated:

"Many of the trial judges believe that they may more satisfactorily perform the duty thus imposed on them by giving such instructions in their own language rather than by reading to the jury those submitted to them in the form of requests. And, when the instruction as given fairly covers the material substance embodied in the requests, error may not be predicated upon such refusal. *People v Kudla,* 223 Mich 137; 193 NW 844 (1923)."

We find that the instruction given by the court in the instant case covered the material substance embodied in the request and, therefore, rule no error resulted.

The defendants also claim error by the trial court in failing to charge the jury on second-degree murder and manslaughter as lesser included offenses. Where there is no evidence present in a case that would show the commission of a lesser offense, it is not error to refuse to so charge. *People v Kolodzieski,* 237 Mich 654; 212 NW 958 (1927).

The record discloses that Bills and Dancer with Walker planned a felony robbery—that Bills had a gun—that they made complete plans and carried these plans out. Dancer was the lookout man and carried out his part in the plan. The robbery, or attempted robbery, took place, and the victim was shot and mortally wounded at the time. If the jury believed that Bills and Dancer were the perpetrators of the crime, the offense could be nothing but felony murder as was charged. *People v Norman,* 14 Mich App 673; 166 NW2d 9 (1968); *People v Stevens,* 9 Mich App 531; 157 NW2d 495 (1968). Defendants' claim in this regard is untenable.

## IV

Did the trial court improperly preclude the de-

fense from cross-examining witness Michael G. Walker relative to another charge pending against him in the same court?

The fact that the witness pled guilty to the other charge was brought out by the prosecutor in his direct examination of the witness. The first mention of this matter upon cross-examination appears in the record as follows:

"*Mr. Burress:* Your Honor, may I see the original of the order of immunity?

"*The Court:* I believe the order to which you make reference is in another file of this court. May be Mr. Easton has a copy of it.

"*Mr. Easton:* I can provide a copy of it, your Honor.

"*The Court:* I think the original was considered by myself in conjunction with the witness's plea of guilty that he tended, the plea of guilty that was accepted.

"*Mr. Easton:* Here's a true copy.

"*Mr. Burress:* Will you mark this, please? (A document was marked as defendant's Proposed Exhibit No. 24 for identification by the court reporter.)

"*Q. (By Mr. Burress, continuing):* I am going to ask you to look at that and ask if you can tell me if that's a true copy of the Order of the Immunity which you received in this case?

"*A. (Mr. Walker):* Yes."

(The exhibit was duly admitted.)

"*Q. (By Mr. Burress, continuing):* Now, Mr. Easton asked you some questions about a previous case in which you pleaded guilty, did he not?

"*A. (Mr. Walker):* Yes, he did.

"*Q.* He asked you if you pled guilty to the original charge and went into the maximum number of years involved in that charge, did he not?

"*Mr. Easton:* Now, Mr. Burress knows full well that wasn't my question. I think it is highly improper for him to ask that question.

"I hate to be misquoted, I didn't ask that question and he knows better.

"I object, I am sure I can't speak for him, I can't say what his purpose is, but I think that's a highly improper question.

*"The Court:* I can't recall Mr. Easton's exact line of inquiry, but there was some earlier reference to the fact that the witness had pleaded guilty to this very court to an offense and he was awaiting sentence.

"Now, as to whether or not there was inquiry as to the sentence allowable by law, I frankly do not recall.

*"Mr. Easton:* That wasn't my point, this was a side issue. It was the way I phrased that question.

*"Mr. Burress:* Your Honor, so that there may be no disagreement, I anticipated this witness will be here tomorrow anyway and I will work through the direct examination and would rephrase it tomorrow if I could.

*"The Court:* All right, sir."

Out of the presence of the jury the following took place:

*"The Court:* Mr. Burress, you have a matter that you wish to put on the record?

*"Mr. Burress:* Yesterday, near the close of testimony, I wished to go into an area of a prior conviction of a witness on the witness stand, of Mr. Walker.

"There was some discussion about the extent of the testimony and I have checked the transcript, on page 62 and 63. The questions which Mr. Easton asked related to the crime that he plead *[sic]* guilty to and in addition to that, there was a series of questions asked as to the maximum penalty and to the potential of what he might be sentenced to when he is sentenced.

"It is my purpose to ask whether or not the charge to which he plead *[sic]* guilty was a reduction or was the entire crime with which he was charged. It was my understanding that it was two counts in the indictment and if I have it correct, the first was breaking and entering a business place which would carry a maximum potential sentence of ten years and that the second was a five year penalty. We want to cross-exam-

ine for the purpose of showing that he was given a substantial break with respect to that charge.

"*Mr. Easton:* In response to that, your Honor, I want to, first of all, indicate what Mr. Burress has said he stands corrected. He said, improperly, that he plead *[sic]* guilty to the original charge. That's not what he said.

"He, Mr. Walker, testified what he plead *[sic]* guilty to was receiving and concealing stolen property over $100. I think that the defense is foreclosed from going into the original charge. I purposely, to kind of steal their thunder, I brought out the bad point that he pleaded guilty to the crime.

"*The Court:* The court agrees with you, Mr. Easton.

"If you're requesting a ruling *in limine,* you may not inquire into the charges as placed against the witness Walker. You may inquire as to any events as to which he has pleaded guilty as a result of the charge of breaking and entering being the last.

"*Mr. Easton:* Your Honor, are they foreclosed from going into the circumstances? I would think they could not ask where it happened and so on.

"*The Court:* That is a prerogative that rests with the proponent of the witness on redirect. It does not extend to a cross-examining party.

"*Mr. Burress:* In other words, I don't want a mistrial—

"*The Court:* You cannot go into the circumstances out of which the plea of guilty was taken.

"*Mr. Burress:* In other words, what stolen property was received and concealed?

"*The Court:* That's correct."

Thereafter on cross-examination of the witness the following appeared:

"*Q. (by Mr. Burress):* Mr. Walker, I want to ask you just a couple more questions. One of those has to do with your plea of guilty in another charge.

"What is the maximum potential sentence on the charge to which you plead *[sic]* if you know?

"*A.* Five years, I believe.

"*Q.* All right.

"Detective Harshberger did indicate to you that he would come down and attempt to do what he could towards the end that you would receive probation, did he not?

"*A.* He indicated to me that he would come down and speak to the judge—

"*Q.* And when—

"*A.* —on my behalf.

"*Q.* When was that?

"*A.* Pardon me?

"*Q.* When was that?

"*A.* That was after the preliminary investigation."

The fact that a plea of guilty was offered and accepted by the court on an unrelated crime, which was committed by the witness after the offense in the instant case, was the subject of limited cross-examination. The trial court's ruling did not preclude the defense from attacking the witness's credibility by showing what was promised him by the authorities as a result of the plea of guilty to the unrelated crime. In fact, defense did exactly that. In this case we find no abuse of discretion in placing reasonable limitations on the extent to which the defense could go into this collateral matter. *People v Duke,* 50 Mich App 714; 213 NW2d 769 (1973).

V

The defendant Dancer contends that a mandatory sentence of life imprisonment for felony murder is unconstitutional as cruel and unusual punishment.

It is well settled that an aider and abettor may be indicted, tried and on conviction be punished as a principal and no denial of due process results from charging an aider and abettor as a principal.

*People v Hooper,* 50 Mich App 186, 191; 212 NW2d 786, 788 (1973), and the cases cited therein.

The felony-murder rule is constitutional. *People v Bufkin,* 43 Mich App 585; 204 NW2d 762 (1972); *People v Moore,* 51 Mich App 48; 214 NW2d 548 (1974). Defendant Dancer's contentions on this issue are untenable.

Affirmed.

All concurred.