Commonwealth *vs.* Richard W. Balukonis
(and a companion case [1]).

Middlesex.    February 2, 1970. — June 19, 1970.

Present: Wilkins, C.J., Spalding, Kirk, Spiegel, & Reardon, JJ.

*Identification. Evidence*, Composite picture, Best and secondary, Relevancy and materiality, Contradiction of witness, Other offence, Of identity. *Robbery.*

At a trial for armed robbery in a bank, testimony of bank employees who had had ample opportunity immediately prior to and during the crime to observe the robbers warranted a conclusion that the witnesses' in-court identifications of the defendants as the robbers were based on such observations and had an origin "independent" of alleged unconstitutional pre-trial identifications of the defendants by the witnesses through photographs and confrontations. [725]

The best evidence rule was not applicable to render erroneous at a trial for armed robbery the admission in evidence of an adequately authenticated composite picture of the defendant. [725–726]

At a trial of two defendants for armed robbery in a bank, there was no error in allowing a witness to testify, in order to show that a personal relationship had existed between the defendants, that he had seen the defendants in a certain other place. [726]

There was no error at a criminal trial, after the mother of the defendant had testified as to where he had lived at certain times, in admitting testimony of a police officer showing prior inconsistent statements by the mother. [726]

At a trial for armed robbery in a bank, there was no error in the admission in evidence of a surveillance camera photograph of the defendant taken at the teller's window of another bank and selected by a witness as a picture of the defendant, where the judge immediately and clearly instructed the jury that the photograph was admitted "only for identification purposes." [727]

Conviction of two defendants for armed robbery in a bank was fully supported by the evidence at their trial, principally by identification testimony of four bank employees who had had ample opportunity immediately prior to and during the crime to observe the robbers. [727]

Two indictments found and returned in the Superior Court on March 11, 1968.

---

[1] Commonwealth *vs.* Fred B. Allen.

The cases were tried before *Moynihan*, J.

*Wilbur A. Hyatt* for the defendant Balukonis.

*Joel R. Labell* for the defendant Allen.

*Dante J. DeMichaelis*, Assistant District Attorney, for the Commonwealth.

SPIEGEL, J. The defendants were found guilty by a jury of armed robbery of the Shirley Cooperative Bank. Each defendant was sentenced to serve for a term not exceeding twelve years or less than eight years. They appealed under the provisions of G. L. c. 278, §§ 33A–33G. The cases are here on a summary of the record, a transcript of the evidence, and a combined total of 101 assignments of error.[2]

On February 2, 1968, there were four employees, all women, working at the bank. They are Gladys S. Will, Doris A. Nowokunski, Edith E. Peterson and Jeannine F. Michaud. Between 9:30 and 9:45 A.M. their attention was drawn to a "disturbance" in front of the bank building. The disturbance was caused by a pack of dogs that were creating problems with the traffic. The dogs ran toward the parking lot on the right side of the bank building. The women moved to a window facing the bank parking lot when their attention was drawn to an automobile "backing in towards the bank." Three of the women saw the defendant Allen alight from the car, walk to the rear of the car, toward the bank, and then walk back to the front of the car. Shortly thereafter the defendant Balukonis entered the bank and approached Mrs. Peterson's teller's window. He asked if he could see the manager. Mrs. Peterson told "him that the manager was out and would be back shortly." She asked if he could be helped by anyone else but he said, "no, he still wanted to see the manager." Balukonis then proceeded to walk back and forth in the bank lobby. Meanwhile, the de-

---

[2] The defendant Allen filed fifty-nine assignments of error and the defendant Balukonis filed forty-two assignments of error. Many of the assignments are generally so interrelated that to treat with them individually would be of no particular value and would unduly lengthen this opinion. Other assignments have not been argued and are therefore deemed waived.

fendant Allen came into the bank and he, too, went to Mrs. Peterson's window. He asked her for change in exchange for four dollar bills that he had placed on the counter. At that time Miss Michaud was going for coffee and as she unlocked the gate which led to the area behind the counter and the vault, Balukonis pushed her back. He held a gun in his left hand and said, "This is a holdup." Balukonis ordered the women into the vault, pulled two paper shopping bags from under his jacket and told the women to fill the bags with the money in the vault. As these events were occurring, Allen went behind the counter and began emptying Mrs. Will's cash drawer. While in the vault Balukonis "kept telling . . . [Allen] to hurry up and get the back door open." Balukonis emptied one shopping bag into the other and after inquiring whether the vault could be opened from the inside, he told the women to lie down in the vault and remain there for ten minutes. Balukonis left the vault and turned the dial on the door. The women remained in the vault about five minutes and then came out. Mrs. Will immediately called the police and locked the bank's front door.

On the day of the robbery each of the women were shown a large number of photographs, but did not pick out any as resembling the defendants. On the morning of February 8, 1968, each of the women viewed about fifteen to twenty new photographs, from which each selected two photographs of Allen. On the evening of February 8, 1968, the women were shown about fifteen additional photographs at their respective homes and each picked out pictures of Balukonis as the other participant in the robbery.

On February 13, 1968, Miss Michaud and Mrs. Nowokunski were driven to the District Court of Lawrence to see if they could identify one of the bank robbers. As they were getting out of the car they saw Allen walking in the street. After entering the court house, they again observed Allen in the court house corridor for about fifteen minutes. A number of other people were present in the corridor at that time. The women informed Chief Saball of the Shirley

police department, who had accompanied them to Lawrence, that the man they had seen in the street and in the corridor was one of the bank robbers. The women then viewed Allen in a court room where he was a defendant in another criminal proceeding and for the third time identified him to Chief Saball as one of the bank robbers. Neither Allen nor his attorney, who was present, was aware that Allen was being observed for purposes of identification with regard to the robbery of the Shirley Cooperative Bank.[3] That same day Miss Michaud and Mrs. Nowokunski were taken to the Lawrence police department, and viewed Balukonis through a "glass" while he was sitting in a room at the detective bureau. Balukonis was the only person in the room dressed in work clothes. On February 15, 1968, Mrs. Will and Mrs. Peterson [4] were taken to State police headquarters in Boston where they viewed Balukonis through a "window" in a room with only one other individual who they knew was not Balukonis. On February 29, 1968, Mrs. Will and Mrs. Peterson [5] were taken to the Lawrence police station and observed Allen through a "one-way mirror" in the detective bureau while Allen was engaged in conversation with one of the several police officers who were present. Each of the women identified Allen as one of the men engaged in the bank robbery.

1. There is no need for us to separately discuss each of the defendants' contentions regarding the identification process. The substance of these contentions is that the pre-trial identifications, together with the in-court identifications of the defendants' pictures, were so unnecessarily suggestive

---

[3] The trial judge granted Allen's motion to suppress the identification testimony regarding this confrontation.

[4] One Jean A. Marcinkewicz, a waitress at the Shirley Restaurant, accompanied Mrs. Will and Mrs. Peterson to the State police headquarters to view Balukonis, and subsequently to the Lawrence police station to view Allen. She identified the defendants as the same two men who entered the restaurant at about 9 A.M. on the morning of the robbery and left about fifteen minutes later. She also stated that she had seen both men at the restaurant between 9 and 10 A.M. on several occasions prior to the date of the robbery and that on each occasion the men were together.

[5] See fn. 4.

that the in-court identifications of the defendants were not "purged of the primary taint" of improper confrontations and therefore were not of an independent source.

We need not determine whether the pre-trial identifications were improper, because even if we assume that they were, we are satisfied that the in-court identifications of the defendants "had an independent origin." *United States* v. *Wade*, 388 U. S. 218, 242. Each of the witnesses had ample opportunity prior to or during the robbery to observe the defendants. Their testimony warrants the conclusion that their in-court identifications were based on their observations of the defendants on February 2, 1968, the day of the robbery and not as the result of the pre-trial confrontations. *Commonwealth* v. *Wilson, ante,* 49, 54–55, and cases cited. As we recently stated in the case of *Commonwealth* v. *Frank, ante,* 250, 254, "Here, an initial confrontation has occurred under circumstances likely to fix in the mind[s] of the witness[es] the identity of the person confronted. Upon . . . subsequent and definite in-court identification[s] of the same person, such in-court identification[s] . . . [are] not rendered inadmissible by an intervening illegal pre-trial confrontation and identification." See *Chapman* v. *California,* 386 U. S. 18. See also *Commonwealth* v. *Wilson, supra.*

2. The defendants maintain that the admission in evidence of a composite picture of them violated the best evidence rule. They argue, too, that the picture was "not authenticated." We confine our comment to these points.

The best evidence rule is applicable to only those situations where the contents of a writing are sought to be proved. *Fauci* v. *Mulready,* 337 Mass. 532, 540–542. As stated in Wigmore, Evidence (3d ed.) § 796, "[T]his rule is usually regarded . . . as not applicable to any objects but writings . . . . So far, then, as concerns objects not writings, a photographic representation could be used without accounting for the original." Consequently, a composite picture does not come within the ambit of the best evidence rule, and our review of the record reveals that there was adequate

authentication. See *People* v. *Imbler,* 57 Cal. 2d 711, 716;
Wigmore, Evidence (3d ed.) § 791 (and supplement).
Compare *Commonwealth* v. *McKenna,* 355 Mass. 313,
326–327. There was no error.

3. The defendant Allen contends that it was error to allow
the witness John Cavaretta to answer affirmatively the
following question: "Did you ever see the defendants,
either Richard W. Balukonis or Fred B. Allen in the Chez
When?" He asserts that the "question was remote and
collateral to the issue of robbery."

We believe that the Commonwealth had the right to
show that a personal relationship existed between the de-
fendants. See *Commonwealth* v. *Redmond, ante,* 333, 338.

4. Allen claims that the court erred in denying his mo-
tion to strike the testimony of Captain Arthur L. White of
the Dracut police since it was valueless and may have
created harmful confusion in the minds of the jury. We
do not agree.

Earlier in the trial Allen's mother had testified that from
the fall of 1967, except for the period immediately prior to
his arrest, when he was living in a hotel on Common Street,
Lawrence, he had lived either at home with her or with his
sister in Lawrence.

White testified that on March 6, 1968, he visited Allen's
mother's house and asked her "if . . . [Allen] was living
with her." She replied that he was not. White then asked
her if she knew where Allen was living and she replied that
he was living "somewhere in Lawrence but she did not know
where." White also stated that Allen's mother told him
she had not seen her son "for about three weeks."

The judge meticulously instructed the jury with regard
to the limited purpose for which White's testimony was
being offered.[6] We believe that the testimony of Captain
White was properly admitted.

_____

[6] The instructions read as follows: "Mr. Foreman, and gentlemen of the
jury, this particular testimony sought to be elicited from this witness is
admitted only for the purpose of showing a prior inconsistent statement on
the part of the witness, Mrs. Allen. Now, whether this testimony offered
here is inconsistent with any statement that she made on the witness stand

5. The defendant Balukonis contends that the "[a]dmission of the surveillance camera photograph of . . . [him] into evidence was prejudicial as imputing prior bad conduct to the defendant."

The photograph was taken at a teller's· window of a bank other than the one where the robbery occurred. The photograph obviously was not admissible to show that the defendants committed the offence with which they were charged or as evidence of "prior bad conduct." The judge was clearly aware of this as is shown by his immediate and clear instructions to the jury that he was allowing the photograph to be admitted in evidence for the limited and sole purpose of identification.[7] There was no error.

6. Finally, the defendants argue that the court erred in denying their motions for directed verdicts. We are satisfied from our review of the testimony that the verdicts were fully supported by the evidence. There was no error in the denial of these motions.

*Judgments affirmed.*

---

is for you to determine as a question of fact. In other words, under the rules of evidence, it is possible, when a witness takes the stand, to impeach the testimony of that witness by showing that at some prior time the witness made a statement which is inconsistent with the statement the witness made on the stand. But it is for the jury to determine what statement the witness made on the stand and it is for the jury to determine whether the later testimony offered to show a prior inconsistent statement does or does not show a prior inconsistent statement. That is for the jury."

[7] The judge instructed the jury as follows: "Mr. Foreman and gentlemen, a word of caution with regard to this picture: Have in mind that this picture is admitted solely as evidence of a picture that this witness selected on February 8 as being a picture of one of the two men whom she saw in the restaurant on February 2. It is admitted only for identification purposes. You will completely disregard the room in which that picture was taken. That is entirely immaterial. It is shown to you simply as evidence of the picture which the young lady picked out on February 8 and identified as one of the two men. So you may examine it, having that in mind." See fn. 4.